FILED

2008 Feb-19  PM 04:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| NANCY L. BARNES, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No.  2:05-cv-02453-HGD |
| | ) | |
| CITY OF BIRMINGHAM, ALABAMA, | ) | |
| a municipal corporation, | ) | |
| | ) | |
| Defendant | ) | |

## **MEMORANDUM OPINION**

The above-entitled civil action is before the court on the motion for summary judgment filed by defendant.  (Doc. #10).  The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c) and Rule 73, Fed.R.Civ.P.  Plaintiff, Nancy Barnes, filed a complaint against the City of Birmingham on November 28, 2005, alleging that she was the victim of retaliation by her employer, the City of Birmingham, in violation of Title VII, 42 U.S.C. §§ 2000e, *et seq.*  (Doc. #1, Complaint).  The motion for summary judgment is now ready for disposition.

## SUMMARY JUDGMENT STANDARD

This matter is considered by the court pursuant to the provisions of Rule 56, Fed.R.Civ.P.  Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Rule 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986).  Thus, summary judgment is appropriate where the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 332, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).  The substantive law governing the action determines whether an element is essential. *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510.  A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, identifying those portions of the pleading, depositions, answers to interrogatories, and admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *see Brown v. Crawford*, 906 F.2d 667, 669 (11th Cir. 1990), *cert. denied*, 500 U.S. 933, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991).

This circuit clearly holds that summary judgment should be entered when the moving party has sustained its burden of showing the absence of a genuine issue of material fact when all the evidence is viewed in the light most favorable to the non-moving party, *Sweat v. Miller Brewing Co.*, 708 F.2d 655 (11th Cir. 1983); *see also, Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512.  The evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in her favor.  *Id*. at 255, 106 S.Ct. at 2514, *citing Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59, 90 S.Ct. 1598, 1608-09, 26 L.Ed.2d 142 (1970).  It is, therefore, under this standard that the court must determine whether the plaintiff can meet her burden of coming forward with sufficient evidence as to each material element of her claim sufficient to permit a reasonable jury to find in her favor.

## RETALIATION

In order to establish a *prima facie* case of retaliation under Title VII, a plaintiff must prove the following elements:  (1) she participated in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there is a causal

connection between the participation in the protected activity and the adverse employment decision. *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000).

Retaliation is a separate violation of Title VII. "To recover for retaliation, the plaintiff 'need not prove the underlying claim of discrimination which led to her protest,' so long as she had a reasonable good faith belief that the discrimination existed." *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994) (quoting *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989)).

Defendant concedes that plaintiff had engaged in protected activity, thus establishing the first element of her claim. With regard to the second and third elements, an "adverse employment action" is conduct that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Gupta*, 212 F.3d at 587. Although "Title VII's protection against retaliatory discrimination extends to adverse actions which fall short of ultimate employment decisions," the plaintiff must still demonstrate "some threshold level of substantiality." *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998). It is necessary to look to the "totality of the alleged reprisals" to determine

whether this burden has been met.  *Id*.  To satisfy the causation requirement, Barnes

has to prove "that the protected activity and the adverse action are not completely

unrelated."  *Id*. at 1457 (internal citations and quotations omitted).  *See also Cotton*

*v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1233 (11th Cir. 2006).

### FACTUAL BACKGROUND

Ms. Barnes is an African-American female who has been employed by the City

of Birmingham since October 1999 as a Correctional Officer with the Birmingham

Police Department.  She alleges that, because she has made a number of complaints

regarding gender discrimination to her supervisors and the EEOC, she has been

retaliated against by the City of Birmingham doing such things as refusing to transfer

her to a day shift, despite a promise to do so, and refusing to grant her requests for

leave.

The Birmingham City Jail has its employees work in one of three shifts.  The

"morning shift" works from 11:00 p.m. until 7:00 a.m., the "day shift" works from

7:00 a.m. until 3:00 p.m. and the "evening shift" works from 3:00 p.m. until 11:00

p.m.  (Barnes Depo. at 23, 24).  Barnes is assigned to the morning shift.

During her employment with the City of Birmingham, Ms. Barnes has

repeatedly requested to be moved to the day shift.  She requested the move because

she and her husband divorced and she had no one to stay overnight with her two

minor children, one of whom was raped when she was talked into leaving the house one night.  Plaintiff's requests have always been refused.

The Birmingham Police Department's policy regarding shift assignments and shift transfer requests provides that "[t]he Policy of the Birmingham Police Department regarding shift assignments is that officers will have their choice **by seniority**, so long as the interest of the Department is kept foremost." (Plaintiff's Ex. 3, Birmingham Police Department Rules and Regulations II, A., 2., a., effective December 15, 1997).

At the beginning of each year, all Correctional Officers file their shift preference form with their Commanding Officer.  Barnes filed hers each year. (Barnes Depo. at 55-56, 60-63).  Ms. Barnes was told repeatedly that she lacked seniority to obtain the requested shift change.  (*Id*. at 51).

### *Grievance Dated December 15, 2003*

According to Ms. Barnes, during late 2003, she submitted her request for a change to the day shift.  On December 12, 2003, she discovered that her request for a shift change had been denied once again.  However, two of her colleagues, John Bonner and Alfonso Crawford, both of whom had less seniority than plaintiff, had been granted shift changes.  (*Id*. at 58).

On December 15, 2003, Barnes filed a grievance with her immediate supervisor regarding this incident.  In this grievance, she stated that "according to Unit Directive 100-1, male and female correctional officers are expected to perform the same duties.  Taking these factors into consideration and that I am a well-trained officer, I do not understand why I was denied my choice of shift."  (Plaintiff's Ex. 4, Employee Grievance dated December 15, 2003).[1]  She stated also that she had been told that there must be a male/female ratio on each shift.  However, she noted that she was senior to four male officers on the day shift, that she was equally able to perform their duties and that denying her a move to the day shift for this reason was discrimination based on sex.  (*Id.*).

Directive 100-1 does, in fact, state that "[m]ale and female officers are expected to perform the same duties."  (Plaintiff's Ex. 5, Birmingham Police Department Policy and Procedures, Unit Detention Directive 100-1, ¶ K, effective November 9, 2001).

### Grievance Dated December 26, 2003

Because plaintiff received no response to her grievance in the allotted time, on December 26, 2003, she wrote up essentially the same grievance and filed it with

---

[1] Although Barnes had filed earlier grievances regarding a conflict she had with a supervisor, this is the first time she complained about less-senior male employees receiving preferential treatment.

Birmingham Police Chief Annetta W. Nunn on January 2, 2004. (Plaintiff's Ex. 8, Grievance to Department Head dated December 26, 2003). On May 4, 2004, Ms. Barnes was notified that she was entitled to a Grievance Hearing before the Jefferson County Personnel Board. The hearing was set for November 5, 2004, but later continued, at defendant's request, until December 3, 2004.

### Settlement Agreement

On December 10, 2004, plaintiff and the City of Birmingham filed with the Personnel Board of Jefferson County a Settlement Agreement and Joint Motion to Dismiss Appeal which stated as follows:

> COMPLAINANT, Nancy Barnes and RESPONDENT, City of Birmingham, hereby jointly move the Personnel Board of Jefferson County to dismiss the appeal with prejudice upon acceptance of the below-listed terms of settlement:
>
> 1. Complainant shall be changed to the day shift when:
>
> 2. A female correctional officer leaves Day shift by either retirement, termination, transfer, or changes from Day shift to another shift, or
>
> 3. Once a group of newly hired correctional officers has completed their required training program and are ready for shift assignments.
>
> 4. Complainant accepts this agreement as being in her best interest.

> 5.   The Personnel Board shall have enforcement jurisdiction over the terms of the settlement.

(Plaintiff's Ex. 12, Settlement Agreement and Joint Motion to Dismiss Appeal dated December 10, 2004).  The signers of this agreement include Ms. Barnes, her attorney, Adam Porter, and Jacinda Anderson and Ted I. Smith, attorneys for the City of Birmingham.  (*Id.*).  The document is labeled as a "motion" to the Personnel Board, although it does not directly state that it is subject to the approval of the Personnel Board.  It is unknown whether Barnes was aware that it had to be approved before it became effective.  Nonetheless, over 14 months later, the Personnel Board refused to approve the agreement, finding that it would adversely affect the seniority rights of other employees.  (Defendant's Ex. 11, Order of Jefferson County Personnel Board dated February 21, 2006).  The Personnel Board Order noted that, since it had rejected the settlement agreement, Barnes was entitled to a hearing on her December 26, 2003, grievance, as well as another grievance that she had filed in the interim.  (*Id.*).

Barnes filed another grievance on May 14, 2004, regarding being ordered by a female supervisor, Regina Williams, to remove a bracelet she was wearing.  In this grievance, she did not complain about sex discrimination, retaliation or her shift

assignment.  (Defendant's Ex. 6, Grievance to Immediate Supervisor dated May 14, 2004).

### Grievance Dated December 21, 2004

However, on December 7, 2004, plaintiff states that she learned that a fellow female corrections officer, Mary Nichols, who was also on morning shift, had been reassigned to the day shift, effective January 22, 2005.  Nichols informed her supervisor, Captain Julius Walker, that she wished to remain on the morning shift and that she would be amenable to Ms. Barnes taking the day shift position.  (Plaintiff's Ex. 13, Memo to Capt. Walker from Nichols and Barnes dated December 7, 2004). A note handwritten on the front of Barnes' and Nichol's memo to Walker states:

> Why did Mary Nichols request Day Shift if she chose to remain on Morning Shift?  Who signed this document? The handwriting[2] looks the same.
> If Mary Nichols is allowed to remain on Morning shift, Officer Jernigan will be next in line for the Day shift. Currently, it will create problems moving Mary Nichols, Sevi Jernigan and another female to evening shift.  Shift Change will remain as is!  Swapping Shifts remains seniority based. (emphasis in original) (*sic*).

 (*Id.*).  This statement is accompanied by an illegible signature.

---

[2]  This is a reference to the signatures of Nichols and Barnes on the memo sent to Walker.

In any event, this request was denied; and another female corrections officer, Sevi Jernigan, was assigned to the day shift instead. (Plaintiff's Ex. 14, Memo from Corrections Supervisor Russell Davis dated December 22, 2004). Barnes was upset by what she perceived as a breach of the agreement she had reached with the City of Birmingham, and she filed another grievance with her immediate supervisor. In it, she states that she learned on December 19, 2003, from Regina Williams that her request to swap shifts with Nichols had been denied. Later she found in her mailbox, a copy of her memo containing the handwritten comments on it referenced above. She stated that she felt it implied that she lied and possibly forged another officer's signature. (Plaintiff's Ex. 15, Grievance to Immediate Supervisor dated December 21, 2004).

Barnes took issue with the statement that swapping shifts was seniority based when male officers junior to her were allowed to work the day shift, while she was not. (*Id.*). In addition, Barnes stated that she believed the City of Birmingham was violating the agreement she had just negotiated with them. She noted that there were no stipulations contained in the agreement about other officers wanting to go to the day shift. Under the agreement, she was to be the next female officer to be moved to the day shift. Barnes stated that she believed that she was being retaliated against with actions that cannot be questioned through the Personnel Board grievance process

because of her previous grievance filed with the Jefferson County Personnel Board. (*Id.*).

The response of her supervisors to this grievance was:

> Officer Nancy Barnes does not have the seniority to go to day shift at this time as an officer. Shift change was made according to seniority. At this time there is one officer who requested day shift, has the time to go and the officer is a female that is senior to Officer Barnes. The female officer[] that Officer Barnes wanted to [swap] with has more time than Officer Barnes and the officer that is going to the day shift.

(Plaintiff's Ex. 16, Immediate Supervisor's Answer to Employee Grievance).

No mention was made in this response about the agreement between the City of Birmingham and Ms. Barnes to obtain her consent to dismiss her earlier grievance in exchange for being the next female to go to the day shift.

### *Grievance Dated December 31, 2004*

Barnes filed another grievance on December 31, 2004, asserting that her immediate supervisor's response to the December 21, 2004, grievance was unsatisfactory because it did not address the agreement made by Captain Walker, Corrections Supervisor Davis, and the City Attorneys to promote her as the next female to the day shift. (Employee Grievance to Department Head dated December 30, 2004). Barnes asserts that this incident is an example of harassment

that she has been undergoing at the jail for quite some time. She then proceeds to outline several more incidents which she believes are incidents of harassment. (*Id.*).

Among others, she states that on December 27, 2004, she requested a referral from her supervisor, Regina Williams, for employee assistance counseling which she claims was denied even before Williams knew the reasons behind her request. (*Id.*). She stated that she later advised another supervisor that her physician had recommended counseling due to job-related stress. The supervisor informed Barnes that she would give her the referral. However, approximately two hours later, Williams called Barnes and told her that she would not be given a referral, that she did not need it and could go on her own. (*Id.*).

She also states that on December 2, 2004, she had requested leave for January 2, 2005. She did not receive a response until December 21, 2004, when she discovered that another, more-junior officer had been granted leave for that day. She requested a form to file a grievance about this. Later that day, her leave was approved. (*Id.*).

Barnes stated that, with the exception of the sex discrimination grievance, she decided not to pursue any of these other claims because she did not want to create any more animosity than she was already receiving. She again stated that she believed the refusal to let her change shifts was harassment for complaints or grievances that she

had filed in the past.  She believed that these actions were taken against her to harass her because they were not "grievable" under civil service system rules, giving her no recourse but to endure it.  (*Id.*).

Barnes notes that she filed her sex discrimination claim because less-senior males were moved to the day shift ahead of her and then waited an entire year for a settlement on that grievance in which it was decided that she would be the next female to move to the day shift.  According to Barnes, the City of Birmingham violated this agreement when it moved another female instead of her into the next available slot.  (*Id.*).

### Grievance Dated January 12, 2005

Barnes received no response from the department head, Chief Nunn, within the allotted time; so on January 12, 2005, she filed a grievance with the Jefferson County Personnel Board.  (Defendant's Ex. 9, Employee's Request to Hearing Officer or Grievance Committee dated January 12, 2005).  In this grievance, she states that she had submitted a request for holiday time for February 5 and 6.  No one else had requested leave for those days.  However, when she did not receive a response, she checked about her request and was told that no vacation time was available at that time because another officer, Officer Cottingham,  was out because of an automobile accident.  However, another officer was approved for leave on January 29 and 30

despite the fact that this was after the time that Officer Cottingham had been involved in the accident.  (*Id.*).

Later the same day she requested leave, Barnes was called into the office of Supervisor Regina Williams and given a letter for a command disciplinary hearing set for January 13, 2005.  Barnes asked what the hearing pertained to and was told that she (Barnes) had been requested to bring in a doctor's excuse when she called in sick the Saturday and Sunday after Thanksgiving, but had failed to do so.  Barnes advised Williams that she had not called in sick after Thanksgiving and asked to see the paperwork so she would know what she was talking about.  Williams told Barnes that she did not have the paperwork, and it was all in the possession of senior supervisor Russell Davis.  (*Id.*).

She further stated that as she was about to make a morning mail run, Williams gave her an incident report and told her to make a copy of it.  Williams stated that she "[didn't] want it to disappear."  The incident was about an inter-office mail-tampering investigation.  This resulted from Barnes receiving a copy of the memo she and Nichols wrote to Captain Walker about swapping shifts that contained the handwritten comments she found objectionable, which she had discovered in her mailbox on December 18, 2004.  (*Id.*).  She stated that she believed that this

investigation was another instance of ungrievable harassment that was being used to continue to harass her for filing previous grievances.  (*Id.*).[3]

### *EEOC Charge*

On February 17, 2005, Barnes filed a charge of discrimination with the EEOC in which she claimed she had been the victim of disparate treatment since 2001 regarding shift assignments that resulted in male corrections officers with less seniority than her being moved to the more desirable day shift.  (Defendant's Ex. 11, Charge of Discrimination dated February 17, 2005).  According to Barnes' Charge of Discrimination, she filed a grievance in 2003 which was resolved with an agreement in 2004 wherein she was advised that she would receive a day shift position when a position came open for a female.  (*Id.*).  As outlined above, Barnes claimed that the City of Birmingham breached this agreement by promoting another female to the next available position instead of her.  (*Id.*).  Since then, plaintiff alleges that she had been given a series of unwarranted disciplinary actions, including a letter of reprimand for not bringing in a doctor's excuse.  (*Id.*).

---

[3] At the time of her deposition, August 31, 2006, Barnes was still awaiting a hearing before the Personnel Board on her grievances that she had elevated to that level.  She was told by an employee of the Personnel Board that none of them would be decided until the first one, pertaining to her December 2003 claim of discrimination, was resolved.  (*See* Barnes Depo. at 90-91).

After an investigation, on August 29, 2005, the EEOC sent Ms. Barnes a letter commonly referred to as a "right to sue" letter.  (*Id.*, EEOC Dismissal and Notice of Rights and Letter dated August 29, 2005).   In this letter, the EEOC official who investigated her claim states that he intended to recommend that a determination be made that Barnes was not subjected to discrimination.  (*Id.*, Letter from EEOC Investigator Leon P. Jones to Barnes dated August 12, 2005).  The investigator states, in pertinent part:

> Specifically, the evidence reveals that you filed a grievance against the Respondent in December 2003, alleging that you were being subjected to different terms and conditions of employment by being denied a shift change.   The documents reveal that you and the Respondent resolved the grievance with the understanding that you could move to the day shift if a senior female employee declines to move to the day shift.   The EEOC was not a party to such an agreement and therefore lacks jurisdiction in the matter. The investigation disclosed no evidence of retaliation by the Respondent.  The Respondent made a policy decision within its administrative authority on how to assign Correctional Officers to various shifts.   Further, your retaliation allegation cannot be substantiated because there is no evidence that you engaged in any protected activity.[4]

(*Id.*).

---

[4] Despite this finding by the EEOC investigation, defendant has conceded that plaintiff engaged in protected activity.

### DISCUSSION

Defendant's stated grounds for summary judgment include its claim that plaintiff cannot make out a *prima facie* case of discrimination because she cannot demonstrate that an adverse employment action occurred or that the adverse action was causally related to her protected activities. (Doc. #11, Defendant's Brief in Support of Summary Judgment, at 12).

Whether an employment action is adverse is decided on a case-by-case basis. *Gupta, supra. See also, Welsh v. Derwinski*, 14 F.3d 85, 86 (1st Cir. 1994) (stating that the ADEA's anti-retaliation provision covers more than discharge, demotion, or failure to promote and that a "case by case review" is necessary to determine whether an employer's actions rise to the level of adverse employment actions for purposes of stating a *prima facie* case of retaliation). To establish an adverse employment action requires a showing that a serious and material change in the terms, conditions, or privileges of employment has occurred. *Gupta, supra.*

Defendant cites a number of cases from the United States District Court for the Middle District of Alabama for the proposition that a mere change in assignments is not an adverse employment action. (Doc. #11, Defendant's Brief in Support of Summary Judgment, at 13-14). It summarizes its position stating that "[a]lthough CO Barnes has offered personal reasons or problems as to why she viewed the denial of

a shift transfer as adverse, she has not proven that an objective person in her situation would view the denial of her request to be a serious and material change." (*Id.* at 14).

The problem with this statement is that the actions taken against plaintiff amount to more than the mere denial of a shift change. In *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), the defendant had argued that a reassignment of duties could not constitute retaliatory discrimination where, as here, both the former and present duties fell within the same job description. The Supreme Court disagreed and stated:

> We do not see why that is so. Almost every job category involves some responsibilities and duties that are less desirable than others. Common sense suggests that one good way to discourage an employee such as White from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable. That is presumably why the EEOC has consistently found "[r]etaliatory work assignments" to be a classic and "widely recognized" example of "forbidden retaliation." 2 EEOC 1991 Manual § 614.7, pp. 614-31 to 614-32; *see also* 1972 Reference Manual § 495.2 (noting Commission decision involving an employer's ordering an employee "to do an unpleasant work assignment in retaliation" for filing racial discrimination complaint); EEOC Dec. No. 74-77, 1974 WL 3847, *4 (Jan. 18, 1974) ("Employers have been enjoined" under Title VII "from imposing unpleasant work assignments upon an employee for filing charges").

> To be sure, reassignment of job duties is not automatically actionable. Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and "should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale*, 523 U.S. at 81, 118 S.Ct. 998.

*Burlington Northern*, 548 U.S. at ___, 126 S.Ct. at 2416-17.

In this case, plaintiff filed a grievance because, although shift changes are supposed to be based on seniority, less-senior male employees were being allowed to move to the day shift, while she was not. In addition, this was not a move she wished to make merely for her own convenience. She testified that she had two minor daughters who had to stay at home at night by themselves because there was no one else to take care of them.

Furthermore, after waiting for more than a year to have her grievance heard before the Jefferson County Personnel Board, the City of Birmingham offered her a compromise agreement to obtain her dismissal of her grievance. The agreement promised to put her in a day shift position when, among other things, "a female correctional officer leaves Day shift by either retirement, termination, transfer, or changes from Day shift to another shift." (Plaintiff's Ex. 12, Settlement Agreement and Joint Motion to Dismiss Appeal dated December 10, 2004). Correctional Officer Nichols was transferred to the day shift but asked to be allowed to stay where she

was.  In effect, she was seeking to change her pending assignment to day shift back to morning shift.  This would seemed to have fit the agreement.  However, instead of honoring the agreement, a different female officer was sent to the day shift and Barnes was required to remain on morning shift.

The City now argues that the agreement subsequently was rejected by the Jefferson County Personnel Board and, thus, its refusal to honor it did not prejudice plaintiff.  However, nothing in the document reveals to plaintiff that this agreement required the approval of the Personnel Board.  The Personnel Board, working at a glacial pace, did not deny approval of the agreement until January 2006.  Plaintiff was represented by counsel during the negotiations that resulted in the agreement.  It is highly unlikely that any counsel would have made such an agreement without it being contingent on the approval by the Personnel Board, preferably in advance of her agreement to dismiss her appeal.  From plaintiff's point of view, there would have been no reason to suspect the agreement would need to be approved because she believed she was already in line, seniority-wise, for the next available slot.  As a result of the City's breach of the agreement, plaintiff's grievance has been put back on the Personnel Board docket, but plaintiff was delayed in her quest to resolve this problem for several years by the actions of the failure of the jail supervisors to honor

the agreement.  A reasonable person could find that refusing to honor the agreement is a retaliatory action that had a significant adverse employment consequence.

In addition to this, Ms. Barnes was subject to several little, "non-grievable" offenses after she filed her 2003 grievance, including the refusal to grant her holiday leave and giving it to a less-senior male officer, and refusing to grant her a referral to Employee Assistance Counseling Program.  The court cannot say, at this point, that these incidents, combined with the jail officials' refusal to honor the terms of the agreement reached between plaintiff and the City Attorney's Office, do not rise to the level of a material or serious change in the terms and conditions of plaintiff's employment. *Wideman*, 141 F.3d at 1456.

Although there is some discussion in the briefs regarding a City policy or police department rule requiring a certain ratio of the number of male correctional officers to the number of male inmates, no evidence of such a policy ever was presented by the movant, the City of Birmingham.  If there is such a policy, it should have been presented to the court.  In addition, there has been no evidence presented to reflect the number of inmates at the Birmingham City Jail and their sex or any evidence that reflects that the number of male guards is consistent with this alleged

policy.[5]  What has been presented is a series of rules and regulations reflecting that

female correctional officers were expected to do the same work as male correctional

officers and that there would be no discrimination in employment or job assignments

based on race or sex.

The bottom line is that attorneys for the City of Birmingham entered into an

agreement with plaintiff in which she agreed to dismiss her grievance in return for the

next day shift slot open to a female officer.  The personnel at the Birmingham City

Jail then promptly ignored the agreement and moved someone else to the shift when

a slot came open.  By this time, plaintiff already had dismissed the appeal of her

grievance.  Although later reinstated by the Personnel Board, this action delayed Ms.

Barnes' ability to air her grievance before the Personnel Board by several years.

To establish the causal relation element of her *prima facie* case of retaliation,

Barnes need only show "that the protected activity and the adverse action are not

completely unrelated."  *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th

Cir. 1994) (quoting *EEOC v. Reichhold Chem., Inc.*, 988 F.2d 1564, 1571-72 (11th

Cir. 1993)).  She has done that by presenting evidence that her supervisors at the

Birmingham City Jail knew of her claims of gender-related discrimination and that

---

[5]  The City of Birmingham faults plaintiff for not presenting some of this evidence; but the fact is this evidence could have just as well been presented by the City of Birmingham, if it supported its case.

the series of adverse employment actions commenced almost immediately after these officials learned she had settled the charge with the City Attorney's Office with an agreement that would allow her to move to the day shift, something they had denied her for several years. *See Donnellon v. Fruehauf Corp*., 794 F.2d 598, 601 (11th Cir. 1986) ("The short period of time [one month] between the filing of the discrimination complaint and the . . . [adverse employment action] belies any assertion by the defendant that the plaintiff failed to prove causation.").

Thus, the court concludes that Barnes has presented sufficient evidence to establish a *prima facie* case of retaliation. Because of that and because the City of Birmingham did not present any evidence of any non-discriminatory "policy" reason or other justification for the adverse employment actions Barnes allegedly suffered in retaliation for filing her charge, she is not required to present any additional evidence in order to survive the City of Birmingham's motion for judgment as a matter of law.

The City of Birmingham claims that, pursuant to *Mt. Healthy Sch. Dist. v. Doyle*, 429 U.S. 279, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the shift assignments of correctional officers are accomplished in a manner consistent with the best interest of the jail, for security purposes and to maintain a balance with the male/female inmate population versus the male/female correctional officer population. The

problem with this argument is that the City of Birmingham is not charged with retaliating against plaintiff by not placing her on her desired shift–it is alleged to have retaliated by refusing to honor an agreement to give her the next available day shift slot and by taking other harassing actions against her. Regardless of whether it is city policy to maintain a certain male prisoner to male correctional officer ratio, the City of Birmingham agreed to send plaintiff to the day shift and refused to do so. There has been no evidence presented reflecting a change of circumstances that would justify the jail personnel's refusal to honor this agreement. Thus, either the agreement was entered into by the City of Birmingham in bad faith, with the City's knowledge that it would not be honored, or the jail personnel retaliated against plaintiff for achieving this concession from the City Attorney's Office by refusing to honor it. All other things being equal, whether the failure to move plaintiff to the day shift in compliance with the agreement was retaliation for her complaint about what she perceived to be discrimination is an issue that should be decided by a jury.

Defendant states in its reply brief that plaintiff has not proven that there exists a municipal practice, policy or custom which would render the City responsible for any alleged constitutional deprivations. In *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that municipalities may not be held liable under 42 U.S.C. § 1983 on a theory of

*respondeat superior*, but may only be held liable for the execution of a government policy or custom.  However, *Monell* identifies when a municipality may be held liable under 42 U.S.C. § 1983; it has no bearing on whether the City of Birmingham is liable for the City Jail's employment practices under Title VII.  *Richardson v. Byrd*, 709 F.2d 1016, 1022 (5th Cir. 1983).  Therefore, this assertion is without merit.

### CONCLUSION

Based on the findings set out above, defendant has failed to demonstrate that there are no genuine issues of material fact with respect to plaintiff's retaliation claim. Therefore, defendant's Motion for Summary Judgment is due to be and hereby is DENIED.

DONE this 19th day of February, 2008.

HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE